**CITY OF READING**

v.

**Mark A. IEZZI, Appellant.**

Commonwealth Court of Pennsylvania.

Argued Sept. 13, 2013.

Decided Oct. 23, 2013.

Reargument En Banc Denied Dec. 9, 2013.

John A. Fielding, III, Reading, for appellant.

Frederick T. Lachat, III, Reading, for appellee.

BEFORE: SIMPSON, Judge, and LEAVITT, Judge, and McCULLOUGH, Judge.

OPINION BY Judge SIMPSON.

In this statutory appeal, Mark A. Iezzi (Iezzi) asks whether the Court of Common Pleas of Berks County (trial court) erred by entering judgment in favor of the City of Reading (City) and against Iezzi in the amount of $1,878.34 for unpaid recycling and trash fees and determining Iezzi failed to preserve any issues for review by not filing a post-trial motion. Iezzi contends post-trial motions are prohibited in statutory appeals such as this. He further asserts the Solid Waste Management Act (SWMA)[1] and the Municipal Waste Plan-

---

1. Act of July 7, 1980, P.L. 380, *as amended,* 35 P.S. §§ 6018.101–6018.1003.

ning, Recycling, and Waste Reduction Act (Act 101)[2] preempt the City from imposing recycling fees. Upon review, we hold the City lacked statutory authority to impose recycling fees; therefore, we reverse on the merits.

## I. Factual and Procedural Background

The City is a third-class city organized and operating under a home rule charter (Charter). Pursuant to Act 101 and its powers under the Charter, the City adopted an ordinance regulating the collection, transportation, storage and disposal of solid waste and recycling and imposing separate fees for these services on persons owning property located within its borders.[3] Iezzi owns property located at 660 N. 12th Street (property) in the City.

In December 2010, the City filed a tax claim of $1,878.34 against Iezzi for delinquent recycling and trash fees due on his property for the years 1999 through 2008. Reproduced Record (R.R.) at 189a. In June 2011, the City filed a writ of *scire facias*[4] against Iezzi's property. *Id.* at 193a.

In response, Iezzi filed an affidavit of defense. *Id.* at 196a. In the affidavit, he stated he utilized a private hauler to pick up trash from 1999 to 2005. In March 2007,

he formed his own "roll-off service" and received approval from the Pennsylvania Department of Environmental Protection (DEP) to collect and provide his own trash hauling service. *Id.* at 197a. He then informed the City he would no longer require its services since participation at that time was voluntary. Thus, Iezzi claimed he did not owe any trash or recycling fees to the City and requested dismissal of the City's *scire facias* writ.

The trial court held a bench trial. At the hearing, Iezzi offered proof that he utilized a private trash hauler for the property for the years in question. In response, *the City agreed to remove all charges from Iezzi's account relating to delinquent trash fees. Id.* at 3a. However, the City continued to seek the *delinquent recycling fees, as well as interest, costs and attorney fees, in the amount of $1,405.17. Id.* at 5a, 203a.

Iezzi defended that he does not owe the recycling fees because neither SWMA nor Act 101 authorize the City to assess recycling fees against property owners or private waste haulers. The trial court rejected Iezzi's defense and entered a judgment in favor of the City and against Iezzi in the amount of $1,878.34 for *both* recycling and trash fees.[5] The same day, the Prothonotary entered a notice of entry of judgment pursuant to Pa. R.C.P. No. 236. Iezzi then filed the present appeal with this Court.[6]

---

2. Act of July 28, 1988, P.L. 556, *as amended,* 53 P.S. §§ 4000.101–4000.1904.

3. The City enacted the ordinance on September 11, 1991, and thereafter amended it four times. *See* Reproduced Record (R.R.) at 12a.

4. As this Court explained in *Newberry Township v. Stambaugh*, 848 A.2d 173, 177 n. 10 (Pa.Cmwlth.2004) (internal citations omitted):
 A writ of *scire facias* is a writ used to enforce payment of a municipal claim out of the real estate upon which such claim is a lien. Specifically, the writ is a mandate to the sheriff which recites the occasion upon which it issues, which directs the sheriff to make known the parties named in the writ that they must appear before the

court and requires the defendant to appear and show cause why the municipality should not be permitted to take some step. The object of a writ of *scire facias* is ordinarily to ascertain the sum due on a lien of record and to give the defendant an opportunity to show cause why the municipality should not have execution.

5. The trial court clearly committed factual error by including the cost of trash fees in the amount of the judgment when the City conceded Iezzi did not owe those fees.

6. As the issues before us involve questions of law, our standard of review is *de novo*, and our scope of review is plenary. *Middletown*

Iezzi did not file a post-trial motion with the trial court.

The trial court issued an opinion in which it submitted Iezzi did not preserve any issues on appeal having failed to file any post-trial motions. Nevertheless, the trial court determined Iezzi's defense lacked merit. The trial court explained Act 101 only preempts municipal authorities from imposing administrative fees on waste haulers. Although Iezzi is a waste hauler, the City assessed the fee against him because he is a property owner. Therefore, the trial court concluded Act 101 did not preempt the City's ordinance because municipalities are authorized to charge property owners for the collection of recyclable materials. Pursuant to the City's ordinance, recycling fees are mandatory, even if the recycling services are not actually used by the property owner.

## II. Issues

In this appeal, Iezzi contends he did not waive all issues on appeal for failure to file a post-trial motion. Iezzi maintains post-trial motions are inapplicable in statutory appeal cases, including *scire facias* matters, pursuant to Pa. R.C.P. No. 227.1(g). Moreover, post-trial motions are not appropriate where, as here, the trial court issued a final judgment, which the Prothonotary entered pursuant Pa. R.C.P. No. 236, before any post-trial motions could be filed. Thus, Iezzi's appeal to this Court was proper.

Iezzi also argues the trial court erred in determining the City was permitted to assess a recycling fee against him. SWMA and Act 101 govern recycling and set forth a comprehensive plan for funding local recycling programs. These acts, however, do not authorize the City to charge fees not expressly set forth in the statute.

*Twp. v. Cnty. of Delaware Uniform Constr. Code Bd. of Appeal*, 42 A.3d 1196 (Pa.Cmwlth.

Thus, the City is not permitted to charge any fees for its recycling program.

## III. Discussion

### A. Post-trial Motions

First, Iezzi contends he did not waive all issues on appeal for failure to file a post-trial motion. According to Iezzi, post-trial motions are inapplicable in statutory appeal cases, including *scire facias* matters, pursuant to Pa. R.C.P. No. 227.1(g). Indeed, the filing of a post-trial motion in a *scire facias* case is a mere nullity. Furthermore, once the trial court entered a final judgment, the judgment became a final, appealable order. Therefore, Iezzi's appeal to this Court was the proper course of action.

The City counters the Pennsylvania Rules of Civil Procedure do not apply to statutory appeals. Rather, the local rules of the courts of common pleas govern. The City maintains, pursuant to the local rule of the Berks County Court of Common Pleas, B.R.C.P. No. 227.1, the parties must file a motion for post-trial relief in all cases. The local rule does not incorporate the statutory appeal exception contained in Pa. R.C.P. No. 227.1(g) or create any other prohibition against the filing of post-trial motions in statutory appeal cases. Therefore, local rule required Iezzi to raise the issues regarding preemption in a post-trial motion. Having failed to do so, the City claims, Iezzi did not preserve any issues for appeal.

Rule 227.1 of the Pennsylvania Rules of Civil Procedure governs post-trial motions practice for civil cases. Subdivision (g) provides:

A motion for post-trial relief may not be filed in an appeal from the final adjudi-

2012).

cation or determination of a local agency or a Commonwealth agency as to which jurisdiction is vested in the courts of common pleas.

Pa. R.C.P. No. 227.1(g). In other words, if jurisdiction over an appeal from a final order of a local agency is vested in the trial court, a motion for post-trial relief may not be filed before filing an appeal. *See* Pa. R.C.P. No. 227. 1, Explanatory Comment—1989.

Despite the clear language of Pa. R.C.P. No. 227.1(g), which explicitly prohibits post-trial practice in statutory appeals, the courts of this Commonwealth continue to permit post-trial practice in those cases where the trial court finds it helpful. *Appeal of Borough of Churchill*, 525 Pa. 80, 575 A.2d 550 (1990); *In re PP&L, Inc.*, 838 A.2d 1 (Pa.Cmwlth.2003); *In re Upset Price Tax Sale for Springfield Twp.*, 700 A.2d 607 (Pa.Cmwlth.1997); *In re Appeal of Sheetz, Inc.*, 651 A.2d 563 (Pa.Cmwlth.), *rev'd per curiam*, 539 Pa. 107, 650 A.2d 443 (1994); *Shapiro v. Center Twp.*, 159 Pa.Cmwlth. 82, 632 A.2d 994 (1993); *Eachus v. Chester Cnty. Tax Claim Bureau*, 148 Pa.Cmwlth. 625, 612 A.2d 586 (1992).

This Court fully discussed the evolution of this position in *Springfield Township.* We concluded:

> In each case where a trial court ruled upon the merits of post-trial motions and this Court quashed the appeal, the Supreme Court reversed and remanded. Accordingly, the Court expressly concludes from a close reading of *Appeal of Borough of Churchill, Shapiro,* and *In re Appeal of Sheetz, Inc.* that, absent some local rule prohibiting the filing of post-trial motions in a particular type of proceeding, *where a trial court has ruled upon the merits of post-trial mo-*

> *tions, that ruling is the order from which an appeal may be taken.*

700 A.2d at 610 (with emphasis added).

As we recognized in *PP&L,* the lessons from the *Churchill–Springfield Township* line of cases are several. All cases addressed appeals taken from the order disposing of post-trial motions. *Id.* In all cases, post-trial practice was permitted where the trial court found it helpful. *Id.* Additionally, "our Supreme Court demonstrated a pronounced preference for disposition of statutory appeals on the merits." *PP&L,* 838 A.2d at 5.

■ Here, Rule 227.1 of the Berks County Rules of Civil Procedure provides:

> (a) A motion for post-trial relief shall be filed with the prothonotary in accordance with B.R.C.P. 207.1 and the prothonotary shall forthwith deliver the motion to the judge assigned to the case for appropriate action.
>
> (b) A motion for post-trial relief may contain a request for a conference to determine what notes of testimony or of other proceedings need be transcribed.
>
> (c) Any claim raised in a motion for post-trial relief which is not supported by argument set forth in a written brief shall conclusively be considered abandoned and waived by the moving party. Any matter so abandoned and waived by the moving party shall not be thereafter considered.

B.R.C.P. No. 227. 1.

Unlike the Pennsylvania Rules of Civil Procedure, the Berks County Rule does not incorporate the statutory appeal exception for post-trial motions created by Pa. R.C.P. No. 227.1(g). Nor does the local rule contain any other prohibition against filing post-trial motions in statutory appeals. Equally important, the rule also does not expressly state that post-trial motions are required in statutory appeals.

Significantly, Rule 227.4(a) of the Berks County Rules of Civil Procedure provides "[n]o judgment shall be entered upon a verdict within the time allowed for post-trial motions, *unless allowed by special order of court.*" B.R.C.P. No. 227.4(a) (emphasis added).

In this case, on October 11, 2011, the trial court entered a "DECISION and VERDICT," in which it ordered "judgment is entered" in favor of the City and against Iezzi. Tr. Ct. Order, 11/11/12, at 1; R.R. at 223a. The same day, the Prothonotary entered a notice of entry of judgment pursuant to Pa. R.C.P. No. 236, notifying Iezzi "that judgment has been entered against" him. R.R. at 224a. Pursuant to Rule 108(b) of the Pennsylvania Rules of Appellate Procedure, "[t]he date of entry of an order in a matter subject to the Pennsylvania Rules of Civil Procedure shall be the day on which the clerk makes the notation in the docket that notice of entry of the order has been given as required by [Pa. R.C.P. No.] 236(b)." Pa. R.A.P. 108(b).

■ Even if we interpreted the local rule as requiring the filing of post-trial motions in statutory appeals, by entering judgment within the time allowed for post-trial motions, the trial court chose to enforce the clear mandate of Pa. R.C.P. No. 227.1(g). As the above-cited precedent consistently holds, it is within the trial court's discretion to invite and entertain post-trial motions in statutory appeals. *See Churchill; PP&L; Springfield Township; Sheetz, Inc.; Shapiro; Eachus.* The trial court chose not to exercise this discretion here. Once the trial court entered "judgment," the decision became a final appealable order. Thus, Iezzi's appeal taken from the trial court's judgment was proper.

**B. Preemption**

Turning to the merits of the appeal, Iezzi contends the trial court erred by upholding the City's recycling fee. Municipalities only have the power expressly granted to them through SWMA and Act 101. SWMA and Act 101 govern recycling and set forth a comprehensive plan for funding local recycling programs. According to Iezzi, these acts do not authorize a municipality to charge fees not expressly set forth in the statute. Thus, the City is not permitted to charge a fee for recycling.

The City counters, its recycling fee is authorized and enforceable. According to the City, Iezzi overlooks the authorization provided by Act 101 and other state laws, such as The Third Class City Code.[7] Act 101 authorizes the City to adopt and implement programs for the collection and recycling of municipal waste or source-separated recyclable material. To do this, the City must have the ability ·to establish, impose and collect reasonable fees and charges for the collection, removal and disposal of waste and recyclables.

The City contends that even though the City is governed by a home rule charter, its ordinance is similar to The Third Class City Code. The Third Class City Code expressly authorizes cities to provide services for "the collection, removal and disposal of garbage, ashes and other waste or refuse material" and to impose and collect reasonable fees and charges for such services. Section 2403(6) of The Third Class City Code, 53 P.S. § 37403(6). According to the City, recyclable material is an "other refuse material."

■ When determining whether the General Assembly intended preemption, we consider the following:

(1) Does the ordinance conflict with the state law, either because of conflicting

---

7. Act of June 23, 1931, P.L. 932, *as amended,* 53 P.S. §§ 35101–39701.

policies or operation effect, that is, does the ordinance forbid what the legislature has permitted? (2) Was the state law intended expressly or impliedly to be exclusive in the field? (3) Does the subject matter reflect a need for uniformity? (4) Is the state scheme so pervasive or comprehensive that it precludes coexistence of municipal regulation? (5) Does the ordinance stand as an obstacle to the accomplishment and execution of the full purposes and objectives of the legislature[?]

*Pennsylvania Indep. Waste Haulers Ass'n v. Northumberland Cnty.*, 885 A.2d 1106, 1109 (Pa.Cmwlth.2005) (quoting *Duff v. Northampton Twp.*, 110 Pa.Cmwlth. 277, 532 A.2d 500, 505 (1987), *affirmed without opinion*, 520 Pa. 79, 550 A.2d 1319 (1988)).

■■ The General Assembly preempted municipal power and responsibility to regulate the storage, collection, transportation, processing, treatment and disposal of municipal waste through SWMA. Section 201 of SWMA, 35 P.S. § 6018.201; *accord Northumberland.* The General Assembly enacted Act 101 to give municipalities the responsibility to plan for the processing and disposal of municipal waste and recycling generated within their boundaries. *Northumberland.* Municipalities only have the power expressly granted to them through SWMA and Act 101. *Id.* In other words, a municipality, as an agent of the state, cannot act contrary to the state. *Id.*

Act 101 provides extensive regulation as to waste and recycling. Pursuant to Act 101, a municipality:

shall have the power and its duty shall be to assure the proper and adequate transportation, collection and storage of municipal waste which is generated or present within its boundaries ... and to adopt and implement programs for the collection and recycling of municipal waste or source-separated recyclable materials as provided in this act.

Section 304(a) of Act 101, 53 P.S. § 4000.304(a). Act 101 defines "municipality" as "[a] county, city borough, incorporated town, township or home rule municipality." Section 103 of Act 101, 53 P.S. § 4000.103. In furtherance of its duties, a municipality may adopt an ordinance "for the recycling, transportation, storage and collection of municipal wastes or source-separated recyclable materials, *which shall not be less stringent than, and not in violation of or inconsistent with, the provisions and purposes of* [SWMA], *this act* and the regulations promulgated pursuant thereto." Section 304(b) of Act 101, 53 P.S. § 4000.304(b) (emphasis added). Thus, Act 101 contains an express preemption provision predicated on inconsistency of municipal regulations of municipal waste disposal and state regulation.

Section 102(b)(2) of Act 101, 53 P.S. § 4000.102(b)(2), includes among the Act's express purposes the following, with emphasis added: "Encourage the development of waste reduction and recycling as a means of managing municipal waste, conserving resources and supplying energy through *planning, grant and other incentives.*"

■ Pursuant to the express purpose, Section 1501 of Act 101 mandates the establishment and implementation of recycling programs. Section 1501(a) of Act 101, 53 P.S. § 4000.1501(a). Act 101 also addresses the General Assembly's plan for funding recycling programs. Significantly, however, a careful review of SWMA and Act 101 reveals there is no mechanism for a municipality to charge a fee for its recycling services; rather, fees for recycling are set by the General Assembly.

For instance, in Section 701, the General Assembly imposes a recycling fee of $2 per ton for all solid waste processed at re-

source recovery facilities or disposed of at municipal waste landfills, to be paid by the operator of such facilities or landfills. 53 P.S. § 4000.701. The fee is to be paid quarterly to DEP,[8] and interest accrues on untimely payments. Sections 702–703 of Act 101, 53 P.S. §§ 4000.702–4000.703.

Those required to pay the fee are allowed to collect it as a surcharge on any fee schedule established for solid waste processing or disposal. Section 705 of Act 101, 53 P.S. § 4000.705. *Collectors* and *transporters* of solid waste, who would be paying such a surcharge, are allowed to pass it through to end users as a surcharge on their own fee schedule established for solid waste collection and transportation. *Id.* For current purposes, it is noteworthy that the City is not a collector or transporter of solid waste; rather, it licenses haulers to perform these services. *E.g.,* R.R. at 65a–75a (1998 Ordinance).

Additionally, Act 101 establishes a Recycling Fund in the State Treasury and directs DEP to pay all recycling fees received into the fund. Section 706 of Act 101, 53 P.S. § 4000.706. Monies placed in the fund are appropriated to DEP for allocation as specified in Section 706 of Act 101, including grants to municipalities for the development and implementation of recycling programs, recycling coordinators, market development and waste reduction studies and research. *Id.* Section 902 sets forth a procedure by which municipalities may apply for such grants and directs DEP to award grants to those municipalities which meet the requirements of the section. Section 902 of Act 101, 53 P.S. § 4000.902. The grant to a municipality to implement a recycling program, as required by Section 1501, is 90% of the approved cost of establishing such. *Id.* A financially distressed municipality is eligible for a grant covering 100% of the approved cost. *Id.*

Additionally, Section 903 directs DEP to award grants to reimburse counties for authorized costs incurred for the salary and expenses of recycling coordinators, of up to 50% of the approved cost. Section 903 of Act 101, 53 P.S. § 4000.903. Section 904 directs DEP to award annual performance grants for municipal recycling programs, upon application from a municipality, but only if the materials collected were actually marketed. Section 904 of Act 101, 53 P.S. § 4000.904.

Consistent with one express purpose of Act 101 ("encouraging development of waste reduction and recycling ... through planning, grant and other incentives"), there is no mention of recycling revenue from other sources. Indeed, Section 1712 of Act 101 provides it shall be an affirmative defense to any action brought against any municipality alleged to be in violation of Section 1501 (which requires the implementation of recycling programs) that such municipality's failure to comply is because the reasonable and necessary costs of operating the program exceed income from the sale or use of collected material, grant money received and avoided costs of processing or disposal. 53 P.S. § 4000.1712.

Moreover, apparently recognizing the funding scheme originally provided for by Act 101 may not fully cover the costs, Section 1513 of Act 101 requires DEP to develop a plan to assist municipalities in making recycling programs financially self-sufficient. 53 P.S. § 4000.1513. Specifically, the plan shall include a market development program (to be funded by the recycling fund) and address the extent to which municipal recycling programs can be sustained by restructuring the allocation of sources.

---

**8.** Act 101 refers to DEP by its former designation as the Department of Environmental Re-

available recycling grants. *Id.* The plan shall also include recommendations to county recycling coordinators designed to encourage market development, and identify the specific means, including legislative changes, DEP intends to use to assist municipalities in making their recycling programs self-sufficient. *Id.* The implication is no funds other than those provided for by Act 101 and related statewide statutes are contemplated.

Indeed, in *Northumberland,* this Court held Act 101 preempted four counties and a municipal authority from imposing an administrative fee on waste haulers to help fund recycling programs. We determined "Act 101 provides a comprehensive recycling plan that provides a specified funding source and does not provide any authority to raise revenue by other means." 885 A.2d at 1110. "[M]unicipal powers are preempted by Act 101 with respect to recycling programs. . . ." *Id.* at 1111.

The City contends *Northumberland* is factually distinguishable from this case. First, in *Northumberland,* the administrative fee involved was duplicative of a fee already imposed by Section 701 of Act 101, 53 P.S. § 4000.701. But, Section 701 did not authorize the counties or the municipal authority to impose their own administrative fee in addition thereto. Second, *Northumberland* involved the propriety of a fee assessed against a waste hauler. Although Iezzi is a waste hauler, the City assessed the fee against him because he is a property owner. Third, *Northumberland* involved counties, which have different duties under Act 101, namely ensuring the availability of adequate permitted processing and disposal capacity for municipal waste generated within its boundaries. *See* Section 303 of Act 101, 53 P.S. § 4000.303 (describing powers and duties of counties). The City argues the ruling in *Northumberland* did not extend to fees imposed by a "municipality other than a

county" to cover the costs related to the duties imposed under Section 304(a) of Act 101 to "adopt and implement programs for the collection and recycling of municipal waste or source-separated recyclables." 53 P.S. § 4000.304(a) (describing powers and duties of municipalities other than counties).

These factual distinctions aside, the law is clear a municipality can only impose a recycling fee if it is authorized. *Northumberland; see* 53 P.S. § 4000.304(b)(1) (ordinance cannot be in violation of or inconsistent with SWMA, Act 101 or its regulations). Neither SWMA nor Act 101 provides such authorization for recycling fees.

Nevertheless, the City argues the holding in *Pennsylvania Independent Waste Haulers Association v. Township of Lower Merion,* 872 A.2d 224 (Pa.Cmwlth.2005), should be extended to allow the City to impose recycling fees. There, waste haulers brought an action against a first class township, seeking a declaratory judgment that the township lacked authority to enforce licensing and inspection provisions of the township's code. Although the law prohibited the township from implementing a licensing and inspection program for garbage and refuse trucks operated in the township, the law did not preclude the township from implementing a licensing and inspection program for the waste and recycling containers located in the township.

With regards to a first class township's powers, Section 304(a) of Act 101 provides "[e]ach municipality other than a county shall have the power and its duty shall be to assure the proper and adequate . . . storage of municipal waste which is generated and present within its boundaries. . . ." 53 P.S. § 4000.304(a). This provision, however, does not contain an authorization for fees.

Nevertheless, pursuant to the First Class Township Code,[9] the township was expressly authorized to:

> prohibit accumulation of ... garbage, rubbish and other refuse materials upon private properties including the imposition and collection of reasonable fees and charges for the collection, removal and disposal thereof, and to prescribe fines and penalties for the violation of such regulations....

Lower Merion, 872 A.2d at 228 (quoting Section 1502 of the First Class Township Code, 53 P.S. § 56527) (emphasis added). Other provisions of First Class Township Code empowered the township to license, inspect and make necessary regulations to promote public health and safety. Id.

In Lower Merion, we determined these powers, when read together, included the township's ability to implement a licensing and inspection program for waste and recycling containers and to charge a fee for the inspection. Id. Accordingly, we reversed the trial court's order to the extent it ruled otherwise.

Significantly, in Lower Merion, the authorization for the municipality to impose and collect reasonable fees came from the First Class Township Code, not Act 101. That authorization pertained to the collection, removal and disposal of "garbage, rubbish and other refuse materials." 53 P.S. § 56527. Obviously, the First Class Township Code does not apply here. Accordingly, the City's reliance on Lower Merion is misplaced.

■ Nevertheless, the City asserts the authorization contained in the First Class Township Code is akin to the authorization contained in The Third Class City Code. Section 2403(6) of The Third Class City Code provides:

In addition to other powers granted by this act, the council of each city shall have power, by ordinance:

> * * *

> 6. **Collection and removal of garbage.**—To provide for and regulate the collection, removal and disposal of garbage, ashes and other waste or refuse material, either by contract or by municipal conduct of such services, and to impose and collect, by lien or otherwise, reasonable fees and charges therefor, and to prescribe fines and penalties for the violation of ordinances regulating such matters.

53 P.S. § 37403(6) (emphasis added). We reject the City's assertion for several reasons.

■ First, similarities in statutes aside, the City's reliance on The Third Class City Code for authorization is misplaced. Although the City is a city of the third class, the City elected to rule by home rule charter. "In general, the adoption of a home rule charter acts to remove a municipality from the operation of the code provisions enumerating the powers of that particular class of municipality." Wecht v. Roddey, 815 A.2d 1146, 1152 (Pa. Cmwlth.2002). As a result, The Third Class City Code does not apply, and the City's argument premised on that Code lacks merit.

Second, The Third Class City Code only authorizes the City to impose fees for the "collection, removal and disposal of garbage, ashes and other waste or refuse material." 53 P.S. § 37403(6). The Third Class City Code does not include recyclables nor define "other waste or refuse material."

The City insists the phrase "other waste or refuse material" must include recycla-

---

9. Act of June 24, 1931, P.L. 1206, *as amended,* 53 P.S. §§ 55101–58502.

bles. However, the City's interpretation is at odds with the definitions for "waste" contained in Act 101 and the City's ordinance, which expressly *exclude* recyclables. Specifically, Section 103 of Act 101 defines "municipal waste" as:

Any garbage, refuse, industrial lunchroom or office waste and other material, including solid, liquid, semisolid or contained gaseous material, resulting from operation of residential, municipal, commercial or institutional establishments and from community activities and any sludge not meeting the definition of residual or hazardous waste in [SWMA] from a municipal, commercial or institutional water supply treatment plant, wastewater treatment plant or air pollution control facility. *The term does not include source-separated recyclable materials.*

53 P.S. § 4000.103 (emphasis added). The City's ordinances contain virtually identical definitions. *E.g.,* R.R. at 84a (1998 Ordinance), 113a (2000 Ordinance). Moreover, both Act 101 and the ordinances define recyclable materials as separate and distinct from waste. 53 P.S. § 4000.103; R.R. at 84a, 113a.

Additionally, the City's ordinances define "refuse" as "all garbage, ashes, leaves, and grass trimmings from residential, municipal, commercial or institutional premises." *Id.* at 84a, 113a–14a. Once again, recyclable material is not encompassed by this definition. We, therefore, reject the City's proffered interpretation that the phrase "other waste or refuse material" includes recyclables.

 The City, pursuant to its Charter and Act 101, adopted ordinances governing the collection, storage, transportation, processing and disposal of municipal solid waste, and providing for a mandatory recycling program in the City. *E.g.,* R.R. at 14a (1991 Ordinance). "A municipality which has a home rule charter may exercise any power or perform any function not denied by this Constitution, by its home rule charter or by the General Assembly at any time." Pa. Const. art. 9, § 2; *accord* Section 102 of the Charter for the City of Reading. However, a home rule municipality's recycling ordinance may not be inconsistent with the provisions and purposes of Act 101. Section 304(b) of Act 101, 53 P.S. § 4000.304(b).

We conclude the City's recycling fee is inconsistent with provisions of Act 101. As discussed above, with regard to recycling, a municipality only has the power expressly granted to it through SWMA and Act 101. *Northumberland.* Neither SWMA nor Act 101 expressly grants a municipality the power to charge, as the City charges here, a "service fee to cover all costs associated with the recycling program." R.R. at 61a (1998 Ordinance); 87a (2000 Ordinance); 147a (2007 Ordinance). Further, as decided in *Northumberland,* such fees are inconsistent with the comprehensive statewide recycling funding provisions in Act 101 and related statutes.

Additionally, we conclude the City's recycling fee is inconsistent with purpose of Act 101. The City's service fee covers "all costs associated with the recycling program." However, one purpose of Act 101 is to "[e]ncourage the development of waste reduction and recycling ... through planning, grant and other incentives." Section 102(b)(2) of Act 101, 53 P.S. § 4000.102(b)(2). Simply, a service fee which covers all costs of recycling does not encourage waste reduction and marketing of recyclables, nor does it use planning, grants or other incentives to attain increased efficiency.

Considering all the foregoing, the City was not authorized to assess recycling "service fees." Thus, the trial court erred by entering judgment against Iezzi for the

delinquent recycling fees. Accordingly, we reverse the trial court.

### ORDER

**AND NOW,** this 23rd day of October, 2013, we **REVERSE** the order of the Court of Common Pleas of Berks County, thereby entering judgment in favor of Mark A. Iezzi.