IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In Re:  Petition of the Township    :
of Jackson to Sell Lot 107,        :    No. 124 C.D. 2021
Wheatland Manor              :    Argued: June 23, 2022
                                    :
Appeal of:  Township of Jackson    :

BEFORE:    HONORABLE MICHAEL H. WOJCIK, Judge
                HONORABLE CHRISTINE FIZZANO CANNON, Judge
                HONORABLE MARY HANNAH LEAVITT, Senior Judge

OPINION
BY SENIOR JUDGE LEAVITT                FILED:  August 1, 2022

The Township of Jackson (Township) appeals an order of the Court of Common Pleas of Lebanon County (trial court), which denied the Township's petition to sell Township land dedicated to a recreational use.  The trial court held that the Township's proposed sale violated the Donated or Dedicated Property Act (Donated Property Act)[1] as well as principles of equitable estoppel.  On appeal, the Township argues that the trial court erred by raising equitable estoppel *sua sponte*; misapplying the doctrine of equitable estoppel; and misapplying the Donated Property Act to its petition.  Specifically, the Township contends that the trial court erred and abused its discretion by not deferring to the Township's judgment that the recreational use to which the land has been dedicated is no longer practicable and has ceased to serve the public interest.  Discerning no merit to the Township's arguments, we affirm the trial court.

---

[1] Act of December 15, 1959, P.L. 1772, *as amended*, 53 P.S. §§3381-3386.

## Background

Wheatland Manor is a residential development of 450 homes located in the Township. The Township's Subdivision and Land Development Ordinance[2] requires a developer to dedicate land for public recreational use or pay fees in lieu thereof. The developer of Wheatland Manor (Developer) opted to donate land to the Township and chose Lot 107, a 5.7-acre parcel, for the donation. By deed dated February 24, 2005, Developer transferred Lot 107 to the Township "forever as a public park or [for] other public purpose." Reproduced Record at 22a (R.R. __).

Lot 107 is subject to a drainage easement and a private road easement, presumably established to facilitate the development of residences in Wheatland Manor. Most of Lot 107 is heavily wooded and connected to a public road by a narrow strip of land. Although the Township Recreation Board recommended against accepting Lot 107, the Township Board of Supervisors (Township Supervisors) voted 2-1 to accept the donation of Lot 107 and dedicate it as a public park. The Township recorded the dedication on March 11, 2014.

Thereafter, the Township studied various options for Lot 107, such as a walking trail, basketball court, and nature preserve. However, some residents expressed concerns that the wooded space might facilitate vagrancy and drug use

---

[2] THE SUBDIVISION AND LAND DEVELOPMENT ORDINANCE OF THE TOWNSHIP OF JACKSON (SALDO), Ordinance No. 3-1975, *as amended*, added by Ordinance No. 2-1997B, §22-510, *see* https://ecode360.com/27062538 (last visited July 29, 2022). *See also* Section 503(11) of the Pennsylvania Municipalities Planning Code, Act of July 31, 1968, P.L. 805, *as amended*, which provides that "[t]he subdivision and land development ordinance may include, but need not be limited to: . . . (11) Provisions requiring the public dedication of land suitable for the use intended; and, upon agreement with the applicant or developer, the construction of recreational facilities, the payment of fees in lieu thereof, the private reservation of the land, or a combination, for park or recreation purposes as a condition precedent to final plan approval. . . ." 53 P.S. §10503(11).

2

and that children might fall from the walking trail, given that the land was steeply sloped.

In March 2020, the Township Recreation Board recommended that Lot 107 be sold, and the Township Supervisors voted unanimously to accept that recommendation. To that end, the Township filed a petition for leave of court to sell Lot 107 for the stated reason that "[d]ue to the topography of the land as well as the cost to maintain said lot," it was not practicable to develop Lot 107 as a public park and this continued use does not "serve the general public interest." R.R. 18a. The petition requested that Lot 107 "be sold with a deed restriction that it may only be used for the construction of a single[-]family dwelling in the Low Density Residential Zone[.]" *Id.*

The trial court scheduled a hearing for September 11, 2020. In its scheduling order, the trial court directed, *inter alia*, that the Township provide public notice of the hearing and that "[a]ny member of the public who wishes to be heard may appear at the scheduled hearing." R.R. 33a. On September 4, 2020, counsel for Carl J. and Lori Walkowiak (collectively, Walkowiaks) filed an entry of appearance on their behalf, which stated, *inter alia*, that the Walkowiaks intended to "to provide evidence and give testimony in the matter." R.R. 38a.

At the September 11, 2020, hearing, Township Supervisors Tom Houtz and Dean Moyer testified. They explained that the topography of Lot 107 did not favor a recreational use because it is heavily wooded, not easily accessed from a public road, and contains a water retention basin. Houtz stated that the Township has incurred "maintenance costs for mowing Lot 107" without receiving "direct use" of the property. Notes of Testimony (N.T.), 9/11/2020, at 28; R.R. 96a. Moyer testified that the Township's proposed options for Lot 107 were "totally turned

3

down" by the residents. N.T., 9/11/2020, at 111; R.R. 178a. For these reasons, the Township decide to sell Lot 107 and use the proceeds to improve other recreational facilities within the Township. Moyer acknowledged that the Township has a $4.2 million surplus.

The Township consulting engineer, Stephen Sherk, testified that there was an "extreme shortage of land set aside for neighborhood parks" particularly in the area where Wheatland Manor is located. N.T., 9/11/2020, at 89; R.R. 156a. However, Lot 107 cannot accommodate soccer fields, baseball fields, or recreational buildings because of its "heavy vegetation and steep slopes," which would require costly excavation. N.T., 9/11/2020, at 59; R.R. 127a. Sherk testified that Lot 107 could best be used to host a walking trail, and "the flatter part in the southeast corner" of the property could be made into a playground or basketball court at a total cost of $80,000. N.T., 9/11/2020, at 59-60, 62; R.R. 127a-28a, 130a.

Lori Walkowiak testified that in December of 2011, she and her husband purchased their property adjacent to Lot 107 because they were promised that it would never have a house built on it. When the Walkowiaks learned that Lot 107 was to be sold and developed for residences, they objected at the Township meeting. The Walkowiaks presented a petition signed by 167 people advocating that Lot 107 remain a Township park.

On November 24, 2020, a second hearing took place. Lori Walkowiak testified that Lot 107 connects Wheatland Manor with two ball fields owned by the Kutztown Fire Company. A trail on Lot 107 connecting Wheatland Manor to the ball fields would allow children to walk to the ball fields without having to cross roads. Lori Walkowiak also testified that in 2012, the Township published a recreation plan stating that Lot 107 is "ideally located" for a small-scale

4

neighborhood park, N.T., 11/24/2020, at 9; R.R. 378a, and in 2017, the Township renamed Lot 107 as "Wheatland Woods Park" and budgeted $75,000 for its development. N.T., 11/24/2020, at 19; R.R. 388a. In 2018, the Township published a preliminary plan for Lot 107, showing a walking path with fencing and a basketball court. The Township also accepted a bid for tree removal. In 2019, the Township paid $172,000 to develop the ball fields on land owned by the Fire Company and paid an annual rental fee to the Fire Company for the Township's use of the fields. Then, in March 2020, the Township Recreation Board did an about face and recommended the sale of Lot 107.

The Walkowiaks both testified that in choosing their lot in Wheatland Manor, they relied upon Developer's representation that Lot 107 would not be developed with houses. The Walkowiaks paid a premium for their lot because of its proximity to the park. The Wheatland Manor marketing and development plan, which was admitted into evidence, showed that all lots located near Lot 107 were priced at a premium. On cross-examination, Lori Walkowiak acknowledged that when she and her husband purchased their property in 2011, the approved land development plan referred to Lot 107 as a "proposed park." N.T., 11/24/2020, at 32; R.R. 401a.

Ann Gruber, a Township resident, testified that the Township has a $4.5 million reserve that could be used for recreational purposes, including the development of Lot 107. Gruber stated that the Township does not prioritize recreational space within the Township.

Township Supervisors Houtz and Moyer testified again at the second hearing. Houtz testified that placing a walking trail on Lot 107 could affect pedestrian safety because of the private road easement. The excavation and grading

5

required to develop Lot 107 would cost about "one and a half times as much [] as it would [] on a flat lot." N.T., 11/24/2020, at 92; R.R. 459a. Moyer voted for accepting Lot 107 from Developer for recreational use, but he did not know "how bad it was until [the Township] really got in there and looked at it and decided it wasn't worth having." *Id.* On cross-examination, Moyer stated that the Township had spent "a couple bucks" on Lot 107 for its mowing maintenance. N.T., 11/24/2020, at 94; R.R. 461a.

Mike Dunkle, chairman of the Township Recreation Board and a resident of Wheatland Manor, testified that members of the Recreation Board

> walked the property, and it's very hilly. It was very thickly wooded. It has a water [] retention basin on it; and the worst part of it is there is a right-of-way going right through the middle of the property.

N.T., 11/24/2020, at 60; R.R. 428a. In spite of the fact that its recommendation was rejected, the Recreation Board worked with the Township engineer, Sherk, to develop a plan for its recreational use. However, Dunkle reiterated that the Recreation Board "didn't want that lot," given its topography and thick woods. N.T., 11/24/2020, at 74; R.R. 442a. Dunkle acknowledged that Developer promised a park in Wheatland Manor; some residents paid a premium to be located near Lot 107; and residents of Wheatland Manor were "dead set against" returning Lot 107 to Developer. N.T., 11/24/2020, at 61; R.R. 429a.

On January 5, 2021, the trial court conducted a third, telephonic hearing. Debra Weaver testified that she lives adjacent to Lot 107 and had worked as a real estate agent for Developer. In her marketing of Wheatland Manor lots, she used the Township's approved land development plan that showed Lot 107 as a proposed park. She also used the deed, which designated Lot 107 "forever as a

6

public park." R.R. 22a. Weaver testified that all residents located close to Lot 107, including herself, paid a $5,000 premium for that privilege.

Other residents testified. Jeffrey Dresely testified that he lives near Lot 107, which was a factor in his purchase decision. He believed having a park within close walking distance was "fantastic." N.T., 11/24/2020, at 102; R.R. 469a. Matthew Lattman testified that he paid a $5,000 premium for his lot because it abutted park land, as shown on the Township-approved development plan. That plan also confirmed that Lot 107 would never be developed for a residence. Rachel Schoffstall testified that she and her husband paid a $5,000 premium for their lot, which abuts Lot 107.

Finally, Kevin Williams, the Township auditor, testified that from an economic standpoint, it was "in the best interest" of the Township to "divest [itself] of that asset." N.T., 1/5/2021, at 39-40; R.R. 356a-57a.

**Trial Court Decision**

The trial court denied the Township's petition to sell Lot 107. Recognizing that Lot 107 was not ideal for recreational development, the Township delayed accepting the deed for almost nine years until 2014. The trial court found that the Township accepted the dedication "as an accommodation to a developer that had invested millions in a development that contributed millions to the [] Township economy" and to the Township's tax base. Trial Court Op. at 15. Specifically, the Township accepted Lot 107 in lieu of Developer's payment of the recreation fee, which the court viewed as a "bargained-for exchange." *Id.* at 19.

The trial court further found that residents of Wheatland Manor relied on Developer's promise, confirmed by the Township's approval of the land development plan, that no house would be constructed on Lot 107. Homebuyers

7

paid a premium price to be located near the promised park. To allow the sale of Lot 107 for residential development would amount to a "bait and switch." Trial Court Op. at 16.

The trial court concluded that the Donated Property Act was applicable because Lot 107 had been "offered for dedication" to the Township within the meaning of Section 2 of the Donated Property Act, 53 P.S. §3382. The trial court relied on *In re Erie Golf Course*, 992 A.2d 75 (Pa. 2010) (*Erie Golf Course II*), and *In re Borough of Downingtown*, 161 A.3d 844 (Pa. 2017), in which the Supreme Court held that properties dedicated as parkland include those that were purchased by a municipality as well as those received as gifts. The trial court found that the Township effectively purchased Lot 107 because it accepted the land in lieu of collecting a recreation fee from Developer.

The trial court held that the court, not the municipality, has been conferred with the "final discretion about how the property should be used." Trial Court Op. at 21, 25 (citing *Erie Golf Course II*, 992 A.2d at 86). The General Assembly has incorporated into the Donated Property Act "salient common [] law principles" of the public trust doctrine so that property dedicated for public use is deemed to be held in trust by the municipality for the benefit of the public. Trial Court Op. at 22-23 (citing *In re Borough of Downingtown*, 161 A.3d at 872). Accordingly, the Township, as trustee, has a fiduciary obligation to maintain donated and dedicated land for public use.

The trial court also held that fundamental fairness and the doctrine of equitable estoppel precluded the sale and development of Lot 107 with one or more houses. In so holding, the trial court relied on *Haines v. Minnock Construction Company*, 433 A.2d 30 (Pa. Super. 1981).

8

In *Haines*, the developer assured a purchaser that the wooded area next to the townhouse she bought would remain as open space. Years later, the developer started to construct a commercial building and another townhouse building on the wooded area, and the homeowner obtained an injunction against the construction. The Superior Court affirmed the injunction, holding that while the agreement between the developer and the homeowner did not comply with the statute of frauds, the developer's promise that the wooded area would remain as open space was enforceable by equitable estoppel.

Here, the trial court found that the Township "actively facilitated" the residents' belief that Lot 107 would remain as a public park. Trial Court Op. at 31. It did so by approving the Wheatland Manor land development plan that designated Lot 107 as a proposed public park. Then, the Township accepted Lot 107 by deed that designated Lot 107 "forever as a public park." R.R. 22a. The Township's recreation plan described Lot 107 as ideally located for a small-scale neighborhood park. The Township renamed Lot 107 as "Wheatland Woods Park" and budgeted approximately $75,000 for its recreational development. Trial Court Op. at 30. The Township never advised the public that the Township might use Lot 107 for any other purpose. Relying on *Haines*, 433 A.2d 30, the trial court held that the Township was estopped from selling Lot 107 for residential development.

Finally, the trial court held that the Township did not satisfy the Donated Property Act, which allows the sale of land that has ceased to serve the public interest. It rejected the Township's argument that the term "public" must be read to encompass the entire population of the Township, which would benefit from the improvement to other recreational facilities paid out of the proceeds from the sale of Lot 107. The trial court observed that residents of Wheatland Manor are also

9

members of the "public" and reasoned that their interest should be prioritized over the interest of "those who live much [farther] away from Lot 107." Trial Court Op. at 35. The trial court concluded that selling Lot 107 would not be in the public interest because the residents of Wheatland Manor would be deprived of needed recreational space.

## Appeal

On appeal,[3] the Township raises four issues, which we combine into three for clarity. First, the Township argues that the trial court erred by raising the defense of equitable estoppel *sua sponte*. Second, the Township argues that the trial court misapplied the principles of the equitable estoppel doctrine to the instant matter. Finally, the Township argues that the trial court erred in its application of the Donated Property Act and abused its discretion by not deferring to the Township's judgment that the original use for which Lot 107 was dedicated is no longer practicable and has ceased to serve the public interest.

## I. Defense of Equitable Estoppel

The Township first argues that the trial court erred by *sua sponte* raising the issue of equitable estoppel. Pennsylvania Rule of Civil Procedure 1030 provides that estoppel is an affirmative defense that must be raised in new matter in a responsive pleading. PA.R.Civ.P. 1030 ("all affirmative defenses including but not limited to . . . estoppel . . . shall be pleaded in a responsive pleading under the heading 'New Matter'"). Here, no opponent of the sale of Lot 107 filed a responsive pleading, let alone raised the defense of equitable estoppel. As such, the Township

---

[3] "On appeal from an order of the [trial] court, this Court's scope of review is limited to determining whether the record is free from legal error and whether the court's factual findings are supported by the evidence." *In re Estate of Berry*, 921 A.2d 1261, 1263 n.1 (Pa. Cmwlth. 2007).

argues that the doctrine of equitable estoppel was not properly raised in the trial court's proceeding.

In response, the Walkowiaks argue that Section 5 of the Donated Property Act provides that residents of the Township "shall have the right to file a protest [to the Township's petition to sell] and, in the discretion of the court, shall be entitled to be heard[.]" 53 P.S. §3385. In accordance with Section 5, counsel for the Walkowiaks filed a praecipe for entry of appearance, and the Walkowiaks testified. In other words, the instant matter proceeded "without the need to file a responsive pleading." Walkowiaks' Brief at 6. The Walkowiaks assert that the issue of equitable estoppel was preserved through their testimony. While the objectors did not use the phrase "equitable estoppel" at the trial court hearings, their written protest and their testimony fully support the trial court's application of equitable estoppel principles.

We start with a review of Section 5 of the Donated Property Act, which provides:

> In all proceedings under this act, the political subdivision shall give at least ten days' notice of the filing of its petition to the Attorney General who may become a party thereto and shall give notice to the public of the proposed date of the hearing, by publication, once a week for three successive weeks in the official legal journal of the county and in a newspaper of general circulation in the municipality, if there be one, or, if not, in a newspaper of general circulation in the county. *Any resident of the political subdivision or any group or organization of residents of the political subdivision shall have the right to file a protest and, in the discretion of the court, shall be entitled to be heard in person or by counsel or to intervene in such action and to be a party thereto.*

53 P.S. §3385 (emphasis added). The public must be notified of the political subdivision's petition, and "any resident" may file a protest and is entitled "to be heard in person." *Id.*

Statutory proceedings, such as those initiated under the Donated Property Act, are not generally governed by the Pennsylvania Rules of Civil Procedure. Our Supreme Court has held that unless statutory proceedings have "incorporated the [R]ules [of Civil Procedure] by reference, they cannot be mandatorily imposed upon the trial courts or parties who litigate such matters." *Appeal of Borough of Churchill*, 575 A.2d 550, 553 (Pa. 1990). *See Expressway 95 Business Center, LP v. Bucks County Board of Assessment*, 921 A.2d 70, 77 (Pa. Cmwlth. 2007) (Rules of Civil Procedure do not apply to tax assessment appeals before trial courts). Trial courts have the right to create and publish local rules to cover statutory proceedings. *Borough of Churchill*, 575 A.2d at 554. However, in the absence of a local court rule, "each trial court has been vested with the full authority of the court to make rules of practice for the proper disposition of cases before them and that [the Supreme Court has] enforced those rules unless they violated the Constitution or laws of the Commonwealth or United States, or [the Supreme Court's] state-wide rules." *Id.*

Here, the Pennsylvania Rules of Civil Procedure have not been incorporated into proceedings conducted under the Donated Property Act, and local rules have not been adopted to cover these proceedings. As such, the Rules of Civil Procedure have no application to petitions filed under the Donated Property Act. Residents are entitled to file a protest and to be heard without following the Rules of Civil Procedure. The Donated Property Act made the Walkowiaks a party-in-

12

interest in the instant matter, and the Township did not object to their appearance before this Court.

Because the Rules of Civil Procedure have no application to proceedings conducted under the Donated Property Act, we reject the Township's argument that the "defense" of equitable estoppel had to be raised by the Walkowiaks in a pleading in order for the doctrine to be brought to bear in a proceeding brought under the Donated Property Act.

## II. Application of the Equitable Estoppel Doctrine

The Township argues, next, that the trial court erred in its application of the doctrine of equitable estoppel. The Township argues it did not make a promise to property owners upon which they relied to their detriment. The objectors, including the Walkowiaks, purchased their lots before the Township accepted the dedication in 2014; it was Developer that made promises about the future of Lot 107. The Township asserts that it merely legislatively "approved" a subdivision plan containing a "proposed park" and that Wheatland Manor residents "had both actual and implied knowledge that there was no guarantee the Township would build a park on Lot 107." Township's Brief at 20, 22.

The Walkowiaks respond that the Township created a reasonable expectation on the part of Wheatland Manor residents about Lot 107 through "misleading words, conduct, and silence[.]" Walkowiaks' Brief at 10-11. These actions caused homeowners near Lot 107 to purchase their lots at a premium, and they will be prejudiced if Lot 107 is sold and developed.

"The doctrine of estoppel is an equitable remedy that may be asserted against the government in this jurisdiction." *Chester Extended Care Center v. Department of Public Welfare*, 586 A.2d 379, 382 (Pa. 1991). "[E]quitable estoppel

13

recognizes that an informal promise implied by one's words, deeds, or representations[,] which leads another to rely justifiably thereon to his own injury or detriment, may be enforced in equity. The two essential elements of equitable estoppel are inducement and justifiable reliance on that inducement." *Belleville v. David Cutler Group*, 118 A.3d 1184, 1199 (Pa. Cmwlth. 2015) (citations omitted). When examining whether the elements of equitable estoppel are present,

> [t]he inducement may be words or conduct and the acts that are induced may be by commission or forbearance provided that a change in condition results causing disadvantage to the one induced. More important, the laws require that . . . [t]he representation or conduct must of itself have been sufficient to warrant the action of the party claiming the estoppel.

*Id.* (quoting *Zitelli v. Dermatology Education & Research Foundation*, 633 A.2d 134, 139 (Pa. 1993)).

While equitable estoppel may be asserted against the government, "the Commonwealth or its subdivisions and instrumentalities cannot be estopped by the acts of its agents and employees if those acts are outside the agent's powers, in violation of positive law, or acts which require legislative or executive action." *Central Storage & Transfer Company v. Kaplan*, 410 A.2d 292, 294 (Pa. 1979) (citation omitted) (Liquor Control Board was not statutorily authorized to enter into a lease for warehouse space that barred recovery by warehouse owner on the basis of estoppel). *See also Commonwealth v. Western Maryland Railroad Company*, 105 A.2d 336 (Pa. 1954) (Commonwealth cannot be estopped from collecting taxes that erroneously were not collected in the past).

Here, the trial court reasoned that the principles of equitable estoppel are implicitly part of the standards to be applied by the courts when presented with an application to sell public land under the Donated Property Act. The trial court

14

found, as fact, that the Township "actively facilitated" the Wheatland Manor residents' belief that Lot 107 would remain as open space. Trial Court Op. at 31. It did so by approving the land development plan designating Lot 107 as a proposed public park; by accepting the donation and dedicating the land to a public park use; and by never advising the public that it might use Lot 107 for any other purpose. The trial court's factual findings that the Township's actions caused the residents to act to their detriment are supported by substantial evidence.

We conclude that the trial court did not err in its application of the doctrine of equitable estoppel. The Township made a promise to hold Lot 107 as a public park and residents relied on that promise to their detriment.

### III. Donated Property Act

Finally, the Township argues that the trial court erred in its application of the Donated Property Act and abused its discretion by not deferring to the Township's judgment that the original use for which Lot 107 was dedicated is no longer practicable and has ceased to serve the public interest. The Township's evidence showed that Lot 107 requires expensive excavation in order to do a robust recreational development; has been sitting vacant for years; and is not serving the public interest. Proceeds from its sale would allow the Township to update other recreational facilities and space in the Township, to the benefit of the entire Township population. The trial court erred in its "narrow focus" on the residents of the Wheatland Manor development. Township's Brief at 14.

The Walkowiaks respond that the trial court had the ultimate discretion to decide whether the continuation of Wheatland Woods Park is no longer practicable and no longer serves the public interest. The record shows that Lot 107 could be developed with a walking trail and a basketball court at a cost of $80,000.

15

The Township failed to show that simply maintaining Lot 107 as open space was impracticable. Further, "public interest" includes the interests of Wheatland Manor residents, as well as all Township residents.

We begin with a review of the Donated Property Act, which governs the use of dedicated property as well as its disposition.

With respect to the treatment of dedicated property, the Donated Property Act states as follows:

> *All lands or buildings heretofore or hereafter donated to a political subdivision for use as a public facility, or dedicated to the public use or offered for dedication to such use*, where no formal record appears as to acceptance by the political division, as a public facility and situate within the bounds of a political subdivision, regardless of whether such dedication occurred before or after the creation or incorporation of the political subdivision, *shall be deemed to be held by such political subdivision, as trustee, for the benefit of the public with full legal title in the said trustee.*

Section 2 of the Donated Property Act, 53 P.S. §3382 (emphasis added). The statute defines "lands" as "all real estate, whether improved *or unimproved*" and a "public facility" as "without limitation any park, theatre, open air theatre, square, museum, library, concert hall, recreation facility or other public use." Section 1 of the Donated Property Act, 53 P.S. §3381. It requires that "[a]ll such lands and buildings held by a political subdivision, as trustee, shall be used for the purpose or purposes for which they were originally dedicated or donated, except insofar as modified by court order pursuant to this act." Section 3 of the Donated Property Act, 53 P.S. §3383.

However, the legislature allows the "trustee" to dispose of the trust property in some circumstances. Section 4 provides as follows:

16

*When, in the opinion of the political subdivision which is the trustee, the continuation of the original use of the particular property held in trust as a public facility is no longer practicable or possible and has ceased to serve the public interest*, or where the political subdivision, as trustee for the benefit of the public, is in doubt as to the effectiveness or the validity of an apparent dedication because of the lack of a record of the acceptance of the dedicated land or buildings, *the trustee may apply to the orphan's court of the county in which it is located for appropriate relief. The court may permit the trustee to--*

(1) Substitute other lands or property of at least equal size and value held or to be acquired by the political subdivision in exchange for the trust property in order to carry out the trust purposes.

(2) If other property is not available, sell the property and apply the proceeds to carry out the trust purposes.

*(3) In the event the original trust purpose is no longer practicable or possible or in the public interest, apply the property or the proceeds therefrom in the case of a sale to a different public purpose.*

(4) Relinquish, waive or otherwise quitclaim all right and title of the public in and to such land and buildings as have been apparently dedicated but for which no formal acceptance appears of record: Provided, only, That the court is satisfied upon hearing the evidence that there is no acceptance by implication arising out of public user or otherwise, the court shall also determine the consideration, if any, to be paid to the political subdivision.

53 P.S. §3384 (emphasis added). Notably, Section 6 states that "[n]othing in this act shall be construed to limit or affect the control by a political subdivision of public lands or buildings acquired by such political subdivision by purchase or condemnation." 53 P.S. §3386.

In the *In re Erie Golf Course* matter, the city filed a petition under the Donated Property Act to sell a municipal golf course because of the city's dire financial condition. In *obiter dictum*, the trial court stated that the Donated Property

17

Act did not apply where there is no formal record of acceptance of a donation by the municipality. However, in that case, the city had formally accepted the golf course. The trial court held that the city's evidence did not prove that maintaining the golf course was no longer practicable and disapproved its sale.

On appeal, this Court construed the Donated Property Act to apply even where there is no formal record of acceptance. We held that the language in Section 2 of the Donated Property Act, *i.e.*, "where no formal record appears as to acceptance by the political subdivision," pertained only to land "offered for dedication"; it did not displace the entire statute with respect to fully-realized dedications. *In re Erie Golf Course*, 963 A.2d 605, 612 (Pa. Cmwlth. 2009) (*Erie Golf Course I*). We further held that Section 4 of the Donated Property Act vested controlling discretion in the political subdivision and that, upon remand, the trial court could not inquire into the wisdom of the city's decision. The city's judgment could be set aside only for bad faith, fraud, arbitrary or capricious conduct or abuse of power. We construed the phrase "no longer practicable or possible" under Section 4 to relate both to physical and to economic impracticability. 53 P.S. §3384. Accordingly, the evidence that the golf course was not financially self-sustaining supported the city's position that the golf course was no longer practicable. *Erie Golf Course I*, 963 A.2d at 613.

On further appeal,[4] the Supreme Court confirmed that the Donated Property Act applies to all fully-realized dedications as well as to those where there

---

[4] The petition for allowance of appeal raised two issues: (1) whether the Commonwealth Court erred in determining that the Donated Property Act was applicable to the golf course property; and (2) if the Donated Property Act was applicable, whether the Commonwealth Court erred in reversing and remanding to the trial court for further proceedings. *In re Erie Golf Course*, 971 A.2d 490 (Pa. 2009). The appellant did not challenge this Court's holding that the phrase "no

18

may be uncertainty as to the municipality's acceptance. The Supreme Court then explained that the Donated Property Act incorporated "salient common [] law principles" of the public trust doctrine. *Erie Golf Course II*, 992 A.2d at 86. Accordingly, the public trust doctrine required that property dedicated to public use requires the municipality, as trustee, to hold the property for the community. It may not convey it to a private party.

The Supreme Court reversed this Court's holding that the municipality's exercise of discretion in filing a petition to divest the dedicated property was dispositive. To the contrary, it held that the "essential discretion lay in the [trial] court, to which appellate court deference is due[.]" *Id.* at 88. The Supreme Court reasoned:

> [Section 4 of the Donated Property Act] does not vest controlling discretion in the political subdivision; rather, it merely specifies under what circumstances the municipality, as trustee, may file an application in an orphan's court. The controlling discretion is squarely reposited in the court. See 53 P.S. §3384 ("The court *may* permit the trustee to" substitute lands or sell the property subject to various prerequisites and conditions (emphasis added)).
>
> In this regard, we agree with *amicus* Downingtown Borough . . . that the [Donated Property] Act shares considerable similarities with the *cy pres* doctrine applicable to charitable trusts. Notably, under the *cy pres* doctrine, a trustee has no discretion to divert from purposes specified by a settlor; rather, the trustee may only lodge an application in a court of equitable jurisdiction, which then exercises its sound discretion in assessing the availability and nature of relief. . . . *The decision of the court of original jurisdiction is subject to deferential appellate review*.

---

longer practicable or possible" under Section 4 of the Donated Property Act encompassed both physical and economic impracticability.

> The careful control exercised by the courts in the *cy pres* arena is on account of the extraordinary nature of a diversionary remedy impacting important rights and interests of the settlor and the public. Such concerns also pertain under the [] Donated Property Act, and, thus, *we believe the Legislature reposited the appropriate discretion in the orphan's court, and not the trustee, for conventional, and very good, reasons. While substantial deference may be due generally to discretionary administrative and legislative acts, presently, the sale of the property was not discretionary with the [c]ity in the first instance in light of its fiduciary obligations and recorded covenant.*

*Erie Golf Course II*, 992 A.2d at 87 (internal quotations omitted; footnote omitted; emphasis added).

In *In re Borough of Downingtown*, 161 A.3d 844, the borough acquired lands both by purchase and by eminent domain to create a public parkland. In the face of financial challenges, the borough sought to sell all the lands for development of commercial and residential uses. A central issue was whether the Donated Property Act applies to lands purchased in part with Project 70 Act[5] funds. The municipality and the purchasing developer argued that once the borough obtained a release from the Project 70 Act restrictions, the subject lands were removed from the strictures of the Donated Property Act. The Supreme Court rejected this argument

---

[5] Act of June 22, 1964 (Special Sess.), P.L. 131, 72 P.S. §§3946.1-3946.22. The Project 70 Act, entitled "Project 70 Land Acquisition and Borrowing Act," was enacted by the legislature to implement Article 8, Section 15 of the Pennsylvania Constitution, which was adopted by the voters of the Commonwealth in 1963, and which provides:

> In addition to the purposes stated in article eight, section seven of this Constitution, the Commonwealth may be authorized by law to create debt and to issue bonds to the amount of seventy million dollars ($70,000,000) for the acquisition of land for State parks, reservoirs and other conservation and recreation and historical preservation purposes and for participation by the Commonwealth with political subdivisions in the acquisition of land for parks, reservoirs and other conservation and recreation and historical preservation purposes, subject to such conditions and limitations as the General Assembly may prescribe.

PA. CONST. art. VIII, §15.

and held the Donated Property Act "covers all property purchased by a municipality which has been dedicated to the public use as a public facility, and necessarily includes property which is purchased by the municipality, in part, with Project 70 Act funds, and thereafter dedicated to public use as a public facility." *In re Borough of Downingtown*, 161 A.3d at 873-74. Recognizing that the Donated Property Act did not define the term "dedication," the Supreme Court provided a definition: "A dedication occurs for purposes of the [Donated Property Act] only when, after a property is acquired, a municipality thereafter commits it to a public use as a public facility, *and* the public accepts that use." *Id.* at 873 (emphasis in original).

With these principles before us, we turn to the central question of whether the Township is entitled to relief under the Donated Property Act. In its petition, the Township alleged that "[d]ue to the topography of the land as well as the cost to maintain said lot," it was not practicable or feasible to develop Lot 107 as a public park and that continuation of the intended use of Lot 107 did not serve "the general public interest." R.R. 18a. The Township argues that the trial court was required to give deference to the Township's determination. Relying on this Court's decision in *Erie Golf Course I*, 963 A.2d at 613, the Township contends that the trial court erred by not considering its evidence that the sloped grassland, the stormwater facility, and the wooded portion of the lot crossed by the private road easement make it cost-prohibitive to develop Lot 107 and would drain the Township's general fund. In any event, Lot 107 has been sitting vacant and not serving the public interest in any way. The Township maintains that the term "public interest" refers to the general public, not the interest of individual landowners who live near Lot 107. Township's Brief at 26.

21

We reject the Township's premise that the trial court was in any degree bound by the Township's determination that the original use of the property is no longer practicable or possible and no longer serves the public interest. The Supreme Court has made it clear that "the sale of the property was not discretionary with the [municipality] in the first instance in light of its fiduciary obligations"; rather, the "essential discretion lay in the [trial] court, to which appellate court deference is due[.]" *Erie Golf Course II*, 992 A.2d at 87-88. The public trust doctrine, which is incorporated into the Donated Property Act, requires the political subdivision to hold the property in favor of the community and not divert it from a public use or convey it to a private party. Section 4 of the Donated Property Act does not vest controlling discretion in the political subdivision; rather, it merely authorizes the municipality, as trustee, to file an application for relief in the trial court. *Erie Golf Course II*, 992 A.2d at 87.

The trial court held that the Township did not make its case under Section 4 of the Donated Property Act that the original use for which Lot 107 was dedicated is no longer practicable or possible and has ceased to serve the public interest. 53 P.S. §3384. Lot 107 has been "dedicated" for recreation purposes, "and the public has accepted [that use]." *In re Borough of Downingtown*, 161 A.3d at 872-73. That Lot 107 has been sitting vacant and unimproved does not change the nature of its dedication to a recreational use. Merriam-Webster's Collegiate Dictionary defines "recreation" as "refreshment of strength and spirits after work" or "a means of refreshment or diversion." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY, https://www.merriam-webster.com/dictionary/recreation (last visited July 29, 2022). Refreshment takes many forms. It does not have to take place on a soccer field; it can take place on unimproved land. Section 1 of the Donated Property

22

Act specifically defines "lands" as "all real estate, whether improved *or unimproved*." 53 P.S. §3381 (emphasis added).

We discern no error in the trial court's judgment. The Township's evidence did not establish that retaining the recreational use for which Lot 107 was dedicated is no longer practicable, physically or financially. The Township can keep the land as open space in its unimproved state, which involves minimum maintenance, as acknowledged by Township Supervisor Moyer. Indeed, the Township concedes that it "could simply do nothing and let Lot 107 sit as is." Township's Brief at 25. Alternatively, as Sherk testified, Lot 107 could be developed with a walking trail and a basketball court at a cost of approximately $80,000. The Township has already budgeted approximately $75,000 for this purpose and enjoys a $4.2 million surplus.

The Township asserts that the trial court abused its discretion because the proceeds from the sale of Lot 107 could be better used by improving another recreational facility in the Township, which would benefit a wider group of residents. We reject the Township's proposed balancing test.

In *In re Estate of Ryerss*, 987 A.2d 1231 (Pa. Cmwlth. 2009), the City of Philadelphia filed a petition to allow it to lease 39 acres of a 65-acre park to a cancer center. The park was located in a dense residential neighborhood and adjacent to the cancer center. The City contended that without the lease, the cancer center would relocate outside the City, which would not serve the public interest. This Court affirmed the trial court's holding that the City's evidence did not establish that the dedicated park had ceased serving the public interest. While the use of the property for cancer research and treatment would also serve the public interest, the Donated Property Act focuses on "whether the original use has *ceased* to serve the

23

public interest, not on whether another use would *better* serve the public interest." *Id*. at 1242 (citing Section 4 of the Donated Property Act, 53 P.S. §3384) (emphasis in original). We concluded that

> [t]he legislature did not draft the statute to allow for a balancing of benefits. If it did permit such balancing, every donated park in the Commonwealth would be at risk of being leased so that cash-strapped municipalities could balance their budgets.

*Id*.

Likewise, here, the question is whether Lot 107 has ceased to serve the public interest, not whether selling Lot 107 to improve other Township recreational facilities is preferable. The trial court found that maintaining Lot 107 as a pocket park continues to serve the interest of the public, particularly those living in Wheatland Manor. The development has 450 homes; 167 people signed a petition seeking to save Wheatland Woods Park. The trial court's finding on public interest is supported by substantial evidence and cannot be set aside.

**Conclusion**

We hold that the Pennsylvania Rules of Civil Procedure do not apply to the Donated Property Act. Accordingly, the Walkowiaks did not need to raise the defense of equitable estoppel in a responsive pleading as the Township asserts. The trial court properly applied the equitable estoppel doctrine in the context of this statutory proceeding. Further, the trial court properly denied the Township's petition to sell Lot 107 under the Donated Property Act because the Township did not establish that Lot 107 cannot be maintained as recreational space or does not serve the public interest. The trial court had the ultimate responsibility to make this judgment.

24

For these reasons, we affirm the trial court's January 15, 2021, order denying the Township's petition to sell Lot 107 of the Wheatland Manor development.

_____

MARY HANNAH LEAVITT, President Judge Emerita

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In Re:  Petition of the Township        :
of Jackson to Sell Lot 107,             :        No. 124 C.D. 2021
Wheatland Manor                         :
                                        :
Appeal of:  Township of Jackson         :

# **O R D E R**

AND NOW, this 1st day of August, 2022, the order of the Court of Common Pleas of Lebanon County, dated January 15, 2021, in the above-captioned matter, is AFFIRMED.

_____
MARY HANNAH LEAVITT, President Judge Emerita